B. LINDAUER ET AL., Respondents, v. J. MEYBERG ET AL., Appellants.

St. Louis Court of Appeals, June 7, 1887.

1. SALES—CHATTELS—DELIVERY.—The delivery of goods at the depot of a common carrier, according to the directions of the attorney of the vendee, is a delivery of the goods to the vendee.

2. —— EVIDENCE, SECONDARY—PRACTICE.—A statement of a witness that he had received certain telegrams, and that he had searched for them in the place where he kept such things, but that he could not find them, is a sufficient foundation for secondary evidence of their contents.

3. —— RES GESTAE.—Evidence of declarations which formed a part of the *res gestae*, and which were in the nature of verbal acts, is admissible in explanation of the transaction.

4. —— PRACTICE.—The admission of testimony which is not disputed, and which does not appear to have been prejudicial to the objecting party, is not ground for reversing a judgment.

5. NEW TRIAL—SURPRISE.—That the appellant did not suppose that certain evidence which was introduced would be introduced, will not warrant the granting of a new trial on the ground of surprise.

APPEAL from the Laclede County Circuit Court, W. S. WALLACE, Judge.

*Affirmed.*

J. P. NIXON and M. N. & LEE SALE, for the appellants.

JAMES MORAN and G. W. BRADFIELD, for the respondents.

THOMPSON, J., delivered the opinion of the court.

The defendants on this record levied an attachment upon certain goods, as the property of H. Hoppe, their debtor. The plaintiffs interpleaded, claiming the goods

as their own.   The issue made upon the interplea was
tried by the court sitting as a jury, and judgment was
given for the interpleaders, from which the attaching
creditors have appealed.

The substantial facts were that Hoppe was carrying
on business as a retail merchant at Lebanon, Missouri,
and, finding himself embarrassed, wrote or telegraphed
to several of his creditors, proposing to go out of business,
and to return to them such of the goods, which he had
purchased of them on credit, as remained unsold.
Among the creditors to whom Hoppe wrote were the
firm of Meyberg & Rothchilds Brothers, a partnership
firm doing business in St. Louis, and, also, Rothchild
Brothers & Company, Hart Brothers, and Lindauer
Brothers & Company, three partnership firms doing bus-
iness in Chicago.   Mr. Rothchild, of Rothchild Broth-
ers & Company, went to Lebanon, and there, professing
to represent the three Chicago firms, employed Mr.
Moran, an attorney-at-law, to represent the three firms
in the transaction which was about to take place.   Mr.
Faulk, also, came to Lebanon, representing the inter-
est of the St. Louis firm of Meyberg & Rothchild
Brothers.   Mr. Hoppe proceeded to invoice his goods, and
to set apart to these four creditors the goods which he
had purchased from them respectively, and which he
still had on hand.   He delivered to Mr. Rothchild, in
person, such goods as he had purchased of Rothchild
Brothers & Company, and Mr. Rothchild boxed them
up and shipped them to Chicago.   He, also, set apart
to Mr. Faulk the portion which he had on hand of goods
which had been purchased from Meyberg & Rothchild
Brothers, of St. Louis.   He also boxed up and depos-
ited at the railway station, at Lebanon, the goods which
he had set apart for Lindauer Brothers & Company and
Hart Brothers, of Chicago.   But Mr. Faulk, being dis-
satisfied with what his firm was receiving, caused the
goods which had been set apart to Lindauer Brothers &
Company, and which had been deposited at the railway

station, in three boxes marked with their address, to be attached, the grounds of the attachment being that Mr. Hoppe was about to remove out of the state, with intent to change his domicile, and was about to remove his property and effects out of the state, with intent to hinder, delay, and defraud his creditors. The evidence tended to show that these three boxes of goods had not been delivered to the station agent, at the time when they were attached by the sheriff, but had been merely unloaded from the wagon for the purpose of being so delivered.

At the trial, the question of the ownership of the goods was made to turn upon the inquiry whether they had been delivered to the agent of Lindauer Brothers & Company, the interpleaders. There was no evidence tending to show that they had been delivered to any agent of these interpleaders, unless Mr. Moran was their agent; and whether Mr. Moran was their agent was the whole question in the case. It seems that the attaching creditors went to trial supposing there would be no evidence that Mr. Moran had, prior to the attachment, been appointed to represent the interpleaders, and supposing that the case would turn upon the question of law, whether a deposit of the goods at the railway station, without their having been accepted by the station agent for shipment, would be tantamount to a delivery to the interpleaders. But Mr. Moran disappointed this supposition by testifying that he had, prior to the attachment, received authority to represent the interpleaders in the premises. He said: "I was employed by Rothchild to act for these three houses, and they have recognized me as their attorney, and dispatched me to ship goods before the attachment suit had commenced." He also testified, at a later stage of the trial: "Mr. Rothchild received the goods on Saturday and Sunday, and left at four o'clock Monday morning. I, as his attorney, attended to his matters for him, and directed Hoppe to get all the goods over to the depot as soon as he could.

* * * I received telegrams from Hart Brothers, and Lindauer Brothers, and A. M. Rothchild, sent from Chicago and Carthage, Missouri, *on Monday, the twenty-fifth of May*, 1885, telling me to receive the goods and ship the goods to them. I did not save these dispatches, and none of them are in my possession now. The substance of the dispatches was to take the goods and ship them to Chicago, Illinois. I have made search for the dispatches where I would have them, but can not find them." The attachment was sued out and levied on May 27.

This testimony, if believed by the trier of the facts, as it must have been, established the agency of Moran for the interpleaders, to receive the goods for them, which, as his testimony, elsewhere given, shows he did. As there was no direct contradiction of this evidence, it was necessarily conclusive of the case in favor of the interpleaders, unless an objection to it, which was made at the trial, and which is pressed upon our attention, is to be regarded as a sound one.

This objection was that the statements of the witness, as to receiving the telegrams, was not the best evidence. The witness having stated that the telegrams had been lost, that he could not find them, after search in the place where he would have kept them, a sufficient foundation was laid for admitting secondary evidence of their contents, and the court properly overruled the objection.

These observations necessarily dispose of the other assignment of error, that the court erred to the defendants' prejudice in allowing Mr. Moran, testifying as a witness, to prove his agency by the declaration of Rothchild, another agent. It should be observed that Mr. Moran testified that he had no knowledge of the authority of Mr. Rothchild to represent these interpleaders, other than that derived from Rothchild himself. The doctrine that agency can not be proved by the unsworn declarations of the person claiming to

be acting as agent, is generally applied in cases where it is sought to charge the supposed principal with the responsibility for the acts of the pretended agent. But we are not aware that the rule has been applied in cases where the principal stands in the position of affirming everything which the person who claims to be his agent has done in his behalf. That is the present case. Moreover, it does not appear in what manner the testimony could have been prejudicial to the attaching creditor, in the state of the record, since the uncontradicted testimony of Moran, elsewhere given, shows that he had received authority to represent the interpleaders in the manner in which he had. Beyond this, it would seem that the declarations of Rothchild were admissible upon another ground. They were a part of the transaction under inquiry. They were made at the time of the division, by Hoppe, of his goods among his creditors, to whom he had determined to return them; they were verbal acts, a part of the *res gestae*. They could not have been eliminated from the history of the subject-matter under inquiry without presenting an imperfect view of it. The mere fact that they failed, or were not sufficient, in law, to establish the agency of Rothchild for the interpleaders, does not necessarily require that they should be excluded as evidence, any more than that any other declarations, showing the intent and purpose of the actors, should be excluded, because they fail to prove some material fact in the case. It may, perhaps, be a sound principle that, in a case of this kind, where the alleged principal is affirming the fact of the agency, and has ratified it, slighter evidence will be admissible to show the existence of the agency at the time at which its existence is contested, than where the principal has disaffirmed and is denying the fact of the agency. At least, it is not the practice of appellate courts to reverse judgments because of the admission of incompetent evidence which

is merely cumulative. Where the evidence is conflicting, and illegal testimony is admitted, the judgment should be reversed. But where there is no conflicting evidence, or the illegal testimony is of such a nature that it does not appear that the objecting party could have been prejudiced by it, the judgment will be allowed to stand. *Carpenter v. Rynders*, 52 Mo. 278; *Haskings v. Railroad*, 58 Mo. 302; *Tuggle v. Railroad*, 62 Mo. 425; *Schlingmann v. Fiedler*, 3 Mo. App. 577. In this case, as there was no evidence whatever tending to contradict the evidence of Moran, that he had received authority, prior to the attachment, from the interpleaders, to receive the goods for them, the result, upon the uncontradicted evidence, must have been the same, if the evidence complained of had not been admitted.

Instructions were submitted to the court by both parties, but the learned judge, through inadvertence, omitted to mark upon them, so as to show which had been given and which had been refused, though the bill of exceptions recites that, as a matter of fact, the court did consider and pass upon them. An objection was made to this omission of the court, and an exception was taken, on the ground that it deprived the party of the benefit of his exceptions on this appeal. Undoubtedly the appellant was entitled to have his exceptions passed upon, and marked in such a manner as to indicate the rulings of the court thereon, prior to, or contemporaneously with, the rendition of the court's finding and judgment. The omission to do this is a practice which can not be sanctioned. Where such an omission has taken place, it is our duty, on appeal or error, to treat the case as though the instructions which the complaining party tendered were refused, and an exception duly saved.

So treating the question in this case, we can not see how the refusal of both the instructions of the defendants in this interpleader proceeding could possibly

have changed the result, or worked any legal prejudice to them; since the judgment which was given was a mere conclusion of law, upon undisputed facts. The instructions which were refused were (1) an instruction in the nature of a demurrer to the evidence, and (2) an instruction to the effect that, unless the interpleaders had full knowledge of the act of Hoppe, in assigning the goods to them, and agreed to accept the goods, and the goods were received by them, the court would find for the defendants. As the uncontradicted evidence affirmed all of these hypotheses, it is quite immaterial whether the court gave or refused this second instruction, since the judgment which was rendered has the necessary effect, in the state of the evidence, of affirming the legal propositions there declared. That the instruction in the nature of a demurrer to the evidence was properly refused, is too clear for discussion.

Outside of all of these considerations, we incline to the opinion that the interpleaders would have been entitled to judgment upon the facts proved, even if the authority of Moran to receive the goods for them had not been established. They have ratified Moran's act by bringing this suit, and a ratification takes effect by relation to the time of the doing of the act which is ratified. It is true, as a general rule, that a ratification will not be allowed thus to take effect where it will operate to displace the rights of innocent third parties which have attached prior to the act of ratification. But it may be seriously doubted whether the defendants in this proceeding are entitled to the benefit of this rule. As already stated, Hoppe, embarrassed and unable to carry on the business, was in the act of returning to several of his creditors the unsold goods which he had purchased of them, respectively. The defendants had received all that he had purchased of them which remained unsold, consisting of a large stock of hats, and, not satisfied with this, they undertook to seize the goods which Hoppe was endeavoring to return to these

interpleaders, thereby in effect making these inter-
pleaders pay the balance of Hoppe's debt to them.
Their position, in a court of equity, would surely not be
entitled to any favor, and their right to succeed in this
proceeding depended upon strict law. The principle
which governs the question of ratification in such a case
seems to be that which was laid down by Dr. Wharton,
in his work on agency. After reviewing at considerable
length the decisions to the effect that a ratification will
not be allowed to disturb the intervening rights of third
parties, that learned and philosophical writer says :
" When we examine more closely the cases, we find that
in most, if not all, of those in which ratifications
have been sustained, some rights of third parties have
been disturbed by the ratification, and hence the rati-
fying party has had the option of holding back until he
could see whether ratification was politic. The true dis-
tinction seems to be this : If ratification on the part
of the principal was an act to be anticipated as morally
certain by parties having an adverse interest, then
the ratification is no surprise to them, and can not mis-
lead them, and they are bound to treat the original
unauthorized act as one which is subsequently to be
authorized." Whart. Agency, sect. 80. This principle,
if a sound one, applies with peculiar force to the state
of facts disclosed by this record. The act which Hoppe
was in the act of doing, so far as it related to these inter-
pleaders, was so plainly beneficial to them that it could
not be doubted by the defendants that if Moran was not
authorized to receive the goods, his act in doing so would
be ratified by them. They had, under the same circum-
stances, been glad to receive the amount which he deliv-
ered back to them. Mr. Rothchild, of Chicago, had
already received the amount which had been delivered
to him for his firm, and had departed with it. If Moran
was not authorized to receive for the interpleaders what
Hoppe set apart for them, their ratification of his officious
act was morally certain. In this state of facts, when the

defendants endeavored, by an attachment, to intercept the goods, they did not put themselves in the position of innocent third parties acquiring vested rights upon the faith of any thing which was being done. They parted with no new consideration, but they took their chances of the almost certain affirmance by the inter-pleaders of what Moran was undertaking to do for them, assuming that he had not antecedent authority. While impressed with the force of these views, we nevertheless do not rest our decision upon this conclusion; because, as the uncontradicted testimony shows that Moran had antecedent authority, the question of ratification may be laid entirely out of view, and it will still remain that the judgment which was rendered was the only legal conclusion which could have been rendered upon the undisputed facts.

The only other question in the case is whether the attaching creditors were entitled to a new trial on the ground of surprise. The alleged surprise consisted of the fact, already stated, that they did not suppose that any evidence would be given to the effect that Mr. Moran had been employed by the interpleaders to receive the goods for them prior to the attachment. Upon this question of surprise several depositions and affidavits were read. These have been examined with care. It is sufficient to say that they do not show that the testimony of the deponents and the affiants, if delivered to a jury or to a court sitting as a jury, on another trial, would change the result. On the contrary, a decided preponderance of the evidence presented by these depositions and affidavits is in favor of the conclusion that Mr. Moran was employed to attend to the interests of the interpleaders at Lebanon, prior to the attachment.

The judgment of the circuit court is accordingly affirmed. It is so ordered. Judge Lewis concurs. Judge Rombauer dissents.